UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY ANDERSON,

    Plaintiff,                                     Civil Action No. 19-CV-11282

vs.                                         HON. BERNARD A. FRIEDMAN

ALEXIS HOLMES, et al.,

    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendants' motion for summary judgment (docket entry 32). Plaintiff has responded and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall grant the motion in part and deny it in part.

*Background*

This is a police misconduct case. Plaintiff Gary Anderson, an instructor at Wayne County Community College ("the college" or "WCCC"), alleges that on January 13, 2018, he "attended a presentation given by law enforcement" that was held for faculty and staff in the college auditorium. Compl. ¶ 8. Plaintiff says that he asked the presenters "about the disparate treatment of minority suspects in relation to Caucasian suspects," following which six WCCC police officers (defendants Holmes, Duneske, Johnson, Davis, Meredith, and Eaves) "made false police reports and accusations against [him] . . . [in] retaliation for Plaintiff's exercise of his clearly established 1st Amendment Constitutional rights." *Id.* ¶¶ 9-11. Plaintiff also alleges that the officers arrested him without probable cause, used excessive force against him, and brought false criminal charges against

him. *Id.* ¶¶ 12-14.

Plaintiff's complaint asserts claims against the arresting officers for violating his rights under the First, Fourth, and Fourteenth Amendments by retaliating against him for his speech, wrongfully arresting and imprisoning him, and using excessive force against him (Count I). Plaintiff asserts a municipal liability claim against the WCCC District for failing to train, discipline, and supervise its officers (Count II). Plaintiff also asserts state law claims against the officers for wrongful arrest, wrongful imprisonment, malicious prosecution, excessive force, gross negligence, and intentional infliction of emotional distress (Counts III-VI).[1]

The parties' depositions and other exhibits shed additional light on what occurred. Plaintiff testified that in the auditorium he "asked[] why are we focusing on the Virginia Tech situation when most of these mother fuckers aren't Asian. . . . I did not refer to the race of the vast majority of assailants. I referenced the race of the example they were using on stage." Pl.'s Dep. at 22-23. Plaintiff further testified that one of the presenters responded to this question and then plaintiff "immediately left the auditorium." *Id.* at 27. Plaintiff conceded that he spoke loudly, as he was seated eight to ten rows from the back of the auditorium, had no microphone, and projected his voice in order to be heard. *See id.* at 26. *See also* Pl.'s Aff. ¶¶ 9-13. Plaintiff denied defendant Holmes' account that he "yelled, this is fucking bullshit and get the white people out of the college."

---

[1] The parties recently stipulated to the dismissal of plaintiff's claim against the officers for intentional infliction of emotional distress and his municipal liability claim. *See* ECF No. 39. The parties also stipulated to dismiss the complaint as to defendant Davis. *Id.* In his response to the instant motion, plaintiff indicates that he is "responding . . . with regard to his 1st Amendment claims against Defendants Duneske and Holmes; his 4th Amendment claims for wrongful seizures against Duneske, Johnson and Holmes; his 4th Amendment claims for excessive force handcuffing against Eaves and Meredith and state law gross negligence handcuffing claims against Eaves and Meredith. Anderson stipulates to the dismissal of all other claims." Pl.'s Resp. at 2.

2

Pl.'s Dep. at 22. Plaintiff also denied another witness' statement that he "aggressively spoke on how it was not right that they were addressing a minority and not the, quote, crazy white people, although he was only verbal, there was a sense of panic." *Id.* at 23-24. Additionally, plaintiff denied that he argued with other members of the audience. *See id.* at 67.

Plaintiff testified that as he was leaving the auditorium, a white, male officer asked plaintiff for his name, which plaintiff declined to provide. *See id.* at 28. This officer allegedly told plaintiff that if he would not identify himself, he would have to leave campus, to which plaintiff responded, "all right, I'll do that."[2] *Id.* at 30. At some point the first officer was joined by a second, and the second officer likewise asked plaintiff to identify himself, but "neither of the officers provided me a reason for why they were seeking my name." *Id.* at 32.

As plaintiff walked toward his car in the parking lot, "several officers" followed him. *Id*. at 34. "They are repeatedly asking me [to identify myself] and I'm repeatedly telling them I am not going to give my name. I am going to instead leave the campus as they instructed." *Id.* Plaintiff got into his car, and the officers "surround[ed] the car." *Id.* at 34-35. A female officer continued to ask plaintiff to identify himself while he sat in his car, and plaintiff continued to refuse. *See id.* at 36-37. A video of this confrontation shows officers asking plaintiff to get out of his car and a female officer telling plaintiff that he had just hit a police vehicle, although plaintiff testified that he did not back his car into that vehicle. *See id.* at 36-37.

---

[2] In his affidavit, plaintiff identifies this officer as defendant Duneske. *See* Pl.'s Aff. ¶ 15. Plaintiff avers that Duneske "stopped me and asked for identification," which plaintiff refused to provide. *Id*. ¶¶ 15-16. "Duneske told me if I didn't identify myself, I would have to leave the campus." *Id.* ¶ 17. "I agreed to leave and walked out of the auditorium." *Id.* ¶ 18. A moment later plaintiff was stopped again, "this time by [defendant] Johnson," who also asked plaintiff for his identification; plaintiff again refused to comply, and he told Johnson he was leaving the campus. Pl.'s Aff. ¶¶ 21-22.

Plaintiff initially disregarded the officers' repeated commands to step out of his car. *See id.* at 41. After plaintiff was allowed to telephone his wife, he got out of his car and was handcuffed and placed into a police vehicle. *See id.* at 43, 46. Plaintiff testified that the handcuffs were excessively tight, that they caused pain in his wrists and numbness in his thumbs, and that the officers ignored his complaints. *See id.* at 47-48. The pain continued for approximately an hour until plaintiff was transferred to local police who applied handcuffs more loosely. *See id.* at 46-49.

Witnesses gave varying accounts of what plaintiff said in the auditorium. One reported that he asked the presenters, "Why are you all wasting our time talking about this Asian man when you know it is the white 'MF's' who are actually doing all the killing." Defs.' Ex. 1. This witness also reported that plaintiff said, "Why are you racist MF's talking about this Asian terrorist when you know it is you white 'MF's' who are doing all the killing." *Id.* Another witness indicated that "[a] man stood up claiming that the example used of terrorist [sic] were wrong. A racist statement was made that it's usually white men." Defs.' Ex. 2. A third witness reported that "[a] man during the presentation[] stood up & aggressively spoke about how it was not right that they were addressing a minority & not the 'crazy white' people." Defs.' Ex. 3. A fourth witness indicated that "a man . . . started going off about the FBI focusing on Michael Chu the 'Asian' bad guy instead of the white people who are committing the majority of these crimes." Defs.' Ex. 4. Some of these witnesses indicated that plaintiff had caused a "sense of panic" in the room, whereas plaintiff testified that he simply asked his question and then left the auditorium.

The WCCC District Campus Safety Department's report of this incident, signed by defendant Eaves, states that plaintiff was arrested for "Felonious Assault-Motor Vehicle/Disorderly Conduct." Defs.' Ex. 5. All of the witnesses listed in this report (Hines, Karic, Figlioli, Torey,

4

Schaefer, Black, McNeary) witnessed plaintiff's allegedly disorderly conduct in the auditorium, not what occurred afterwards in the parking lot. Eaves' report states, in relevant part:

> Circumstance: I received information of a disorderly person in the Heinz Center during the Active Shooter Presentation. Lt. Holmes informed me that Mr. Anderson was loud using profanity drawing attention from the FBI active shooter presentation to himself. She also stated that due to his behavior he began arguing with several unknown faculty members in the crowd. When Mr. Anderson was approached by Lt. Duneske, Lt. Holmes, and Lt. Johnson, he proceeded to walk out the door to the East parking lot. Mr. Anderson refused several times to identify himself when asked. Once I responded to the East parking lot where I met up with Captain Livadic, Lt. Holmes, and Lt. Duneske, Mr. Anderson then entered his vehicle still refusing to identify himself. Lt. Duneske, Captain Livadic, and Lt. Holmes approached Mr. Anderson's vehicle with Captain Livadic and Lt. Holmes being on the driver side of the vehicle and Lt. Duneske being behind the Vehicle. Mr. Anderson jumped inside of his vehicle and proceeded to reverse his car nearly hitting Lt. Duneske. Lt. Duneske had to leap out of the way to avoid being struck by Mr. Anderson's Vehicle. Mr. Anderson continued backing out of the parking space and collided with marked Police Vehicle patrol car #7 causing damage to his rear bumper and the front fender of the patrol car.
>
> Once Mr. Anderson struck the Police Vehicle Mr. Anderson was asked to exit his vehicle many times by multiple officers. Mr. Anderson was then escorted out of vehicle by Officer Eaves, Lejeuno and Meredith and placed in handcuffs (doubled locked and checked for comfort) and placed into Motor-2 by Police Officer Meredith and Police Officer Eaves. Taylor PD arrived at 12:16 hrs. Sgt. Kaczor and Cpl. Pilchak after a brief investigation Mr. Anderson was turned over to and transported to Taylor PD. . . .
>
> Observation: I observed Mr. Anderson back into patrol car 7. I also saw Lt. Duneske jump from behind Mr. Anderson's vehicle.

Defs.' Ex. 5. A supplemental WCCC District Campus Safety Department case report states that plaintiff "attempted to flee the scene backing up into Police Vehicle (7) hitting right front passenger wheel. There appeared to be no visible damage to the Police Vehicle." Defs.' Ex. 11.

5

The Taylor Police Department Case Report indicates that plaintiff was arrested for aggravated assault and disorderly conduct.[3] The narrative portion of this report states in relevant part:

> On 01/13/2018 at approximately 1200 hours I (Cpl. Pilchak) was dispatched to 21000 Northline (Wayne County Community College) along with Sgt. Kaczor on a report of an individual that caused a disturbance and almost struck a police authority employee at the college with his vehicle. We made the location and spoke with members of the police authority and the following occurred:
>
> I spoke with Alexis Holmes (Listed Witness) who i[s] employed with the WCCC police authority who stated the following:
>
>        \*   \*   \*
>
> -During the seminar a B/M (later identified as Garry Anderson/Listed Arrestee) stood up and began yelling expletives.
> -Holmes stated Anderson yelled "This is fucking bullshit!" and "Get the white people out of college".
> -Holmes stated there were approximately 50-60 people attending the seminar.
> -After causing the disturbance Anderson quickly exited the building and out into the parking lot.
>
> I spoke with Brian Duneske (Listed Victim) who is employed with the WCCC police authority who stated the following:
>
> -Duneske's rank is lieutenant.
> -He was on duty and in full uniform.
> -He had observed Anderson in the parking lot and enter his vehicle.
> -He was motioning over to other members of WCCC police authority that he had located Anderson.
> -Duneske stated he was standing a few feet behind Anderson's vehicle when he suddenly put the vehicle in reverse.
> -Duneske stated he had to jump out of the way to avoid being struck by Anderson's vehicle.
> -Duneske was not injured.

---

[3] In his affidavit, plaintiff avers that these charges were dismissed three months later. *See* Pl.'s Aff. ¶ 44.

> I spoke [with] Deyonta Davis (Listed Driver) who is employed with WCCC police authority who stated the following:
>
> -Davis['] rank is officer.
> -She was on duty, in full uniform and driving a fully marked police authority vehicle (Dodge/listed).
> -She was operating that vehicle and making her way to where Duneske was out with Anderson.
> -As she arrived is when Anderson put his vehicle in reverse nearly striking Duneske.
> -Anderson bumped Davis['] front passenger tire causing no damage and placed his vehicle in park.
> -Anderson was handcuffed and detained in another police authority vehicle without incident.
>
> -I took the handcuffs off Anderson and then rehandcuffed (D/L) and searched him.
> -Anderson was placed inside Sgt. Kaczor['s] vehicle and transported to Taylor PD without incident . . .

Defs.' Ex. 7.

Defendant Holmes testified that she was present in the auditorium and heard plaintiff "yelling, he was saying something about racial, it was something in regards to some racial issues, and I know he was saying he was cussing, like, quote me, fucking bullshit, get the white people out of college." Holmes Dep. at 15. She believed plaintiff had disturbed the peace. *See id*. at 25. As she followed plaintiff out of the auditorium and to his car, she repeatedly asked him to identify himself, but he disregarded her. *See id.* She also indicated that when plaintiff backed up his car, he hit defendant Davis' police vehicle that had pulled up behind him and nearly hit Duneske, who "had to jump out of the way." *See id.* at 27, 29. At that point, plaintiff "was getting arrested for operating a vehicle, still not identifying himself, and destruction of property." *Id.* at 28-29. Plaintiff initially refused the officers' commands to get out of his car, but he eventually complied after being allowed to telephone his wife. *See id.* at 29-31. Holmes testified that defendant Meredith

7

handcuffed plaintiff. *See id.* at 31.

Defendant Johnson testified that he was patrolling in the hallway when the incident in the auditorium occurred. *See* Johnson Dep. at 9. Someone pointed plaintiff out to him as he was leaving the auditorium. *See id.* at 12-13. Johnson attempted to speak with plaintiff, and Johnson asked him to identify himself, but plaintiff did not respond. *See id.* at 14. Johnson recalled defendants Holmes and Duneske following plaintiff as well. *See id.* at 15. When plaintiff proceeded toward the parking lot and refused to stop, Johnson returned to the building. *See id.* at 16-17. He did not return to the parking lot, and he did not see plaintiff being arrested. *See id.* at 19-20.

Defendant Duneske testified that he heard a radio message indicating that there was a disturbance in the auditorium. *See* Duneske Dep. at 12. In the hallway outside the auditorium, Duneske saw Johnson asking plaintiff for his identification, but plaintiff "never stopped walking" and "proceeded out the front doors, left to the parking lot." *Id.* at 13. Plaintiff "said nothing" in response to Johnson. *Id.* at 14. Holmes followed along as well while plaintiff proceeded toward the parking lot, and she also asked plaintiff for his identification. *See id.* at 19-20. Plaintiff unlocked his car and got in without saying anything. *See id.* at 19. Duneske then went to the passenger rear side of the car "to keep people away and so that no crowds or anything would gather." *Id.* Plaintiff put his car in reverse, and Duneske "had to jump back, and then plaintiff backed into the patrol vehicle that was behind him." *Id.* at 20. Duneske estimated that plaintiff backed up two to three feet. *Id.*

Defendant Davis testified that she came to that part of the parking lot in response to a radio request and that she parked her patrol vehicle behind plaintiff's car because she was directed to do so by Duneske. *See* Davis Dep. at 23, 25-26. As Davis arrived, plaintiff put his car in reverse

8

and nearly struck Duneske. *See id.* at 22. Davis could not recall that her vehicle sustained any damage, and she acknowledged reporting to the Taylor police that there were "no injuries or damage." *Id.* at 24.

Defendant Eaves testified that he was in his patrol vehicle when he first saw plaintiff approaching his car. *See* Eaves Dep. at 12-13. During the parking lot incident, Eaves was "[w]atching the other officers who were engaging Mr. Anderson. They were trying to get him to identify himself." *Id.* at 18. Eaves testified that the damage to Davis' patrol vehicle was "minor because [plaintiff's] . . . rear bumper hit the tire of the police car." *Id.* at 21. Eaves did not see plaintiff's car almost hit Duneske. *See id.* at 25. Eaves "possibly" remembered assisting Meredith in handcuffing plaintiff. *Id.* He recalled plaintiff complaining that the handcuffs were too tight, and they "were loosened and readjusted." *Id.*

Defendant Meredith testified that he assisted in handcuffing plaintiff and that plaintiff did not complain about the handcuffs being too tight. *See* Meredith Dep. at 18-19. Meredith indicated that his general practice is to ensure that handcuffs are "double-locked and tension checked," and that if an arrestee complains about tightness he makes sure he can slide a finger between the handcuffs and the arrestee's skin. *Id.* at 20. Meredith believed plaintiff was in the WCCC officers' custody for approximately fifteen minutes before he was turned over to the Taylor police officers. *See id.* at 21. He did not see plaintiff's car strike any police vehicles. *See id.*

***Defendants' Motion for Summary Judgment***

Defendants seek summary judgment on all of plaintiff's claims. As noted above, the remaining claims and defendants in this matter are the First Amendment retaliation claim against Duneske and Holmes; the Fourth Amendment unlawful seizure claim against Duneske, Johnson, and

9

Holmes; and the Fourth Amendment and state law gross negligence claims for painful handcuffing against Eaves and Meredith. All other claims are dismissed, and the complaint is dismissed entirely as to defendants Davis and the WCCC District.

> In deciding this motion, the Court
>
> > must view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020). "This includes drawing 'all justifiable inferences' in the nonmoving party's favor." *George*, 966 F.3d at 458 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jackson-VHS*, 814 F.3d at 775 (quoting *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505).

*Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021).

*Discussion*

*A. First Amendment Retaliation*

Plaintiff claims that defendants Duneske and Holmes retaliated against him for exercising his First Amendment rights by "subject[ing] [him] to wrongful detention." Pl.'s Resp. at 11. As plaintiff notes, and as defendants concede, a First Amendment retaliation claim has three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Having reviewed the parties' briefs and exhibits, the Court concludes that this claim cannot be resolved on summary judgment because the

facts are genuinely disputed as to each of these elements.

First, it is disputed whether plaintiff was engaged in protected conduct. Defendants argue that plaintiff breached the peace and that "there was a sense of shock and panic in the auditorium after Plaintiff Anderson made his statements." Defs.' Summ. J. Br. at 11. While there is evidence to this effect, plaintiff's testimony is that he asked a single question: "[W]hy are [the panelists] focusing on the Virginia Tech situation when most of these mother fuckers [committing such shootings] aren't Asian?" Pl.'s Dep. at 22; Pl.'s Aff. ¶ 9. As there is no recording of the event, plaintiff's version must be accepted for present purposes. Plaintiff had a First Amendment right to ask this question, despite any offense or discomfort it may have caused others. *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate breathing space to the freedoms protected by the First Amendment'") (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)); *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) ("it is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"). If, as plaintiff has testified, he simply asked this question, then he engaged in conduct protected by the First Amendment. Therefore, in the context of this motion, the Court finds that plaintiff has met the first element of the *Blatter* test.

The second and third elements of *Blatter* are met as well. Both of the police case reports indicate that plaintiff was arrested for "disorderly conduct."[4] The WCCC District Campus

---

[4] Although neither of the case reports provides these citations, defendants indicate in their summary judgment motion that plaintiff was arrested "for suspected violations of both MCL 750.82 and MCL 750.170." Defs.' Summ. J. Br. at 19. Section 750.82 concerns felonious assault. Section 750.170, which concerns "disturbance of lawful meetings," prohibits a person from "mak[ing] or excit[ing] any disturbance or contention in any . . . election or other public

Safety Department case report clearly linked the alleged disorderly conduct to plaintiff's speech, as all seven of the witnesses listed therein gave statements as to what occurred in the auditorium. Both case reports indicate that Holmes reported that plaintiff was "disorderly" and "caused a disturbance" in the auditorium. Based on this evidence, a jury could find that plaintiff was arrested, at least in part, because of his speech.

The Court concludes that plaintiff's First Amendment retaliation claim must be resolved at trial. Defendants are not entitled to qualified immunity, as a person's right not to be arrested for the content of his speech is clearly established. *See Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007); *Sandul v. Larion*, 119 F.3d 1250, 1253 (6th Cir. 1997). Whether defendants actually violated this right in the present case depends on whether plaintiff's speech was protected by the First Amendment and, if it was protected, whether defendants arrested him because of that speech. These questions involve factual disputes that cannot be resolved on summary judgment.

## B. Fourth Amendment Unlawful Seizure

Plaintiff next claims that defendants Duneske, Johnson, and Holmes violated his Fourth Amendment rights by seizing him unlawfully. This claim has nothing to do with the arrest, which plaintiff does not challenge (except for the excessively tight handcuffing, as discussed below). Rather, plaintiff claims that he was unlawfully detained before he was arrested:

> [T]he first unlawful investigatory stop/seizure began immediately after Anderson questioned the FBI panel about their failure to mention white terrorists, rather than focusing on an Asian-American terrorist. Duneske unlawfully stopped Anderson and requested his identification almost immediately, as Anderson walked toward the door of the auditorium; Anderson then went into the restroom; Johnson joined Duneske and conducted a second unlawful

---

meeting where citizens are peaceably and lawfully assembled."

>investigatory stop/seizure after Anderson left the restroom by stopping Anderson and requesting identification. After Anderson left the building, Holmes joined Duneske (without Johnson) and both requested that Anderson stop and provide his identification as Anderson was walking to his vehicle. After Anderson got in his vehicle, Duneske moved to the rear passenger side of Anderson's car and directed a WCCCD police vehicle being driven by Officer Deyonta Davis to pull up behind Anderson's vehicle. At that time, a number of WCCCD officers surrounded Anderson's vehicle, resulting in a third unlawful investigatory stop/seizure. These Defendants quickly requested an investigatory stop/seizure based solely upon Anderson's questioning of the FBI panel. Thus, these Defendants lacked reasonable suspicion and probable cause for any investigatory stop/seizure.

Pl.'s Resp. at 18-19.

This claim fails as to the first and second alleged "detentions" because no seizure within the meaning of the Fourth Amendment occurred when the officers asked plaintiff to identify himself. Plaintiff testified that Duneske, Johnson, and Holmes asked him to identify himself but that he refused to do so and continued walking to his car. Plaintiff avers that Duneske "stopped me and asked me for identification" and that "I stopped at Duneske's request but refused to provide identification." Pl.'s Aff. ¶¶ 15-16. Plaintiff also avers that he "was stopped again, this time by Johnson [who] also asked me [to] provide identification," but "I indicated that I wouldn't give any identification and was leaving the campus." *Id.* ¶¶ 21-22. These momentary encounters, during which plaintiff was not physically stopped or frisked, or further questioned or delayed, and was simply asked to identify himself, which plaintiff refused to do and continued walking, cannot be characterized as any type of Fourth Amendment seizure under *Terry v. Ohio*, 392 U.S. 1 (1968), or any other authority that plaintiff has cited or of which the Court is aware. To the contrary, the Supreme Court has held that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or

13

show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007). Plaintiff's freedom of movement was not restrained in any way by the officers asking him to identify himself. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment").

However, plaintiff's freedom of movement clearly was restrained when Duneske directed Davis to position her patrol vehicle directly behind plaintiff's car, thereby preventing plaintiff from leaving. Under *Brendlin*, a seizure occurred at this moment. Viewing the evidence in the light most favorable to plaintiff, a jury could find that Duneske had no basis for restricting plaintiff's movement. Plaintiff testified that Duneske first accosted him in the back of the auditorium, as plaintiff was "proceeding to leave." Pl.'s Dep. at 28; Pl.'s Aff. ¶ 15. Duneske testified that he first saw plaintiff in the hallway, but for present purposes the Court must accept plaintiff's version of the events. The Court must also accept plaintiff's testimony that he simply asked the question quoted above, listened to a panelist's response, then proceeded to leave, and that "[n]o panic existed in the auditorium; no one started arguing with me; [and] no one left the auditorium with me." Pl.'s Aff. ¶ 14. If this is true, and if Duneske was present in the auditorium and observed nothing different, he would have had no basis to believe that plaintiff had been disorderly or had breached the peace. In that event, Duneske would have had no grounds to suspect that plaintiff was involved in any criminal activity, and he would have had no lawful basis to stop plaintiff from driving away.

Defendants cite no authority for the proposition, and the Court is aware of none, that a police officer may detain a person merely for refusing to identify himself. As noted above, the

14

Fourth Amendment does not prohibit a police office from asking a person to identify himself. But if the person refuses to do so, and if the officer has no reasonable suspicion that the person has committed or is about to commit an offense, then the person is free to be on his way. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("*if* there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information") (emphasis added). Indeed, according to plaintiff, Duneske asked him to identify himself and, when plaintiff declined to do so, Duneske told plaintiff "then you will have to leave the campus," to which plaintiff responded, "all right, I'll do that." Pl.'s Dep. at 30. If this is true, then plaintiff did nothing more than Duneske instructed by proceeding to his car and attempting to drive away. When Duneske directed Davis to block plaintiff in, plaintiff had done nothing to warrant any restriction on his freedom of movement. Under this scenario, Duneske violated plaintiff's Fourth Amendment rights by subjecting him to an unreasonable seizure.

Duneske is not entitled to qualified immunity as to this claim because the law is clearly established that a police officer must have at least a reasonable suspicion that a person is involved in criminal activity before the officer may detain him. *See Crawford v. Geiger*, 656 F. App'x 190, 204 (6th Cir. 2016) (noting that it has been clearly established for many years that "an officer must have a reasonable suspicion of criminal activity to even briefly seize an individual"). The suspicion must be based on "specific and articulable facts." *Terry*, 392 U.S. at 21. Whether Duneske was aware of such facts is disputed, but based on plaintiff's version of the events, a jury could find that Duneske had no reason to believe that plaintiff had violated the law in any way.

***C. Excessively Tight Handcuffs***

Plaintiff also claims that defendants Eaves and Meredith violated his rights under the Fourth Amendment and under state law when they handcuffed him too tightly and ignored his complaints. The law governing this claim is clear:

> The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure. *See Kostrzewa*, 247 F.3d at 639. This right was "clearly established" for qualified immunity purposes at the time of [plaintiff's] seizure on October 30, 2002. *See id.* at 641. In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing. *See Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005).

*Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). Under Michigan law, allegations of excessively tight handcuffing can support a gross negligence claim if a plaintiff shows that the defendants' conduct was "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Jackson v. Lubelan*, No. 350239, 2020 WL 5496088, at *12 (Mich. Ct. App. Sept. 10, 2020) (quoting Mich. Comp. Laws § 691.1407(8)(a)).

The facts concerning each of the *Morrison* elements, and of defendants' alleged gross negligence, are sufficiently disputed that these claims must proceed to trial. Plaintiff testified that when Eaves and Meredith handcuffed him, the handcuffs were so tight that they caused pain in his wrists and numbness in his thumbs. Pl.'s Dep. at 47; Pl.'s Aff. ¶¶ 35, 39-40. Plaintiff also testified that the officers ignored his complaints. Pl.'s Dep. at 47-48; Pl.'s Aff. ¶¶ 36-37. Plaintiff says that defendants left him in this condition for approximately an hour until he was transferred to local police who applied handcuffs more loosely. Pl.'s Dep. at 47-49; Pl.'s Aff. ¶ 42. Additionally, plaintiff avers that afterward he sought medical attention for his wrists and that his physician

diagnosed "damage to the nerves of my wrist," that he has received physical therapy for this injury, and that he continues to have pain and loss of strength in both wrists. Pl.'s Aff. ¶¶ 45-47. An examining physician has diagnosed plaintiff with "[i]njury to wrists." Pl.'s Ex. 3.

Eaves recalled plaintiff complaining about the tightness of the handcuffs and testified that he loosened them. *See* Eaves Dep. at 25. Meredith could not recall whether he handcuffed plaintiff but "believe[d] [he] had a part in it." Meredith Dep. at 18. As noted above, Holmes testified that it was Meredith who handcuffed plaintiff. *See* Holmes Dep. at 31. Meredith denied that plaintiff complained about the tightness of the handcuffs. *See id.* at 19. Meredith also stated that plaintiff was in handcuffs for fifteen minutes before the Taylor police arrived. *See id.* at 21. Plainly, there are factual disputes as to the tightness of the handcuffs, whether plaintiff complained, whether defendants loosened them, and how long plaintiff was in them. Because a jury could reasonably find in plaintiff's favor, both on his Fourth Amendment claim and his state law gross negligence claim, these claims cannot be resolved on summary judgment.

Nor are defendants entitled to qualified immunity, as the law has been clearly established for many years that police officers violate the Fourth Amendment by applying handcuffs in a painfully tight fashion and ignoring the arrestee's complaints. *See Morrison, supra*; *Martin v. Heideman*, 106 F.3d 1308 (6th Cir. 1997).

***Conclusion***

For the reasons stated above, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim that defendants Duneske, Johnson, and Holmes violated his Fourth Amendment rights by asking him to identify himself. Defendants are not entitled to summary judgment on plaintiff's claims that (1) Duneske and Holmes retaliated against him for exercising his

17

First Amendment rights, (2) Duneske violated plaintiff's Fourth Amendment rights by directing Davis to block him with her patrol vehicle, and (3) Eaves and Meredith violated his Fourth Amendment and state law rights by applying handcuffs too tightly. Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted in part and denied in part as follows: The motion is granted as to plaintiff's claim that defendants Duneske, Johnson, and Holmes violated his Fourth Amendment rights by asking him to identify himself, but otherwise the motion is denied.

                                                                    s/Bernard A. Friedman
                                                                    BERNARD A. FRIEDMAN
Dated: June 1, 2021                     SENIOR UNITED STATES DISTRICT JUDGE
        Detroit, Michigan